AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Virginia ▼



AUG 16 2018

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Information associated with atenderheartva4@gmail.com<br>that is stored at premises controlled by Google, Inc. | )<br>)<br>)<br>)<br>)<br>) |

Case No. 3:18SW191

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A, fully incorporated by reference herein;

located in the _____ Eastern _____ District of _____ Virginia _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, fully incorporated by reference herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | *Offense Description* |
|---|---|
| 21 U.S.C. § 1349 | Conspiracy to Commit Wire Fraud and Health Care Fraud |
| 21 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1347 | Health Care Fraud |

The application is based on these facts:

See attached Affidavit, fully incorporated by reference herein.

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Leah C. Wynn, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 08/16/2018 _____

/s/

Roderick C. Young
United States Magistrate Judge

City and state: Richmond, Virginia

Roderick C. Young, United States Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>Information associated with atenderheartva@gmail.com, atenderheartva2@gmail.com, atenderheartva4@gmail.com, atenderheartva5@gmail.com and scoobythedrummer@gmail.com that is stored at premises controlled by Google, Inc. | Case No. 3:18SW191<br><br>**FILED UNDER SEAL** |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Leah C. Wynn, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a warrant to search the following email accounts:

atenderheartva@gmail.com, atenderheartva2@gmail.com, atenderheartva4@gmail.com,

atenderheartva5@gmail.com and scoobythedrummer@gmail.com ("SUBJECT EMAIL

ACCOUNTS"), stored at premises controlled by Google, Inc. (Google), an e-mail provider

headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043.  The email accounts

to be searched are described in the following paragraphs and in Attachment A, incorporated

herein by reference.  This affidavit is made in support of an application for a search warrant

under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google to disclose to

the government copies of the information (including the content of communications) further

described in Section I of Attachment B, incorporated herein by reference.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI), currently assigned to the Richmond, Virginia Field Office.   I have been an FBI Special Agent since June 1999.  During my career as an FBI Special Agent I have conducted numerous investigations involving violations of federal criminal law and am currently assigned to investigate matters pertaining to white collar crimes, and more specifically, those violations that are related to health care fraud.  Throughout my law enforcement career, I have been involved in the execution of approximately one hundred federal search warrants.

3.      The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents, investigators and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that evidence and instrumentalities of violations of Title 18, United States Code, Sections 1349 (conspiracy), 1343 (wire fraud), and 1347 (health care fraud) are presently located in the SUBJECT EMAIL ACCOUNTS.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by Title 18, United States Code, Section 2711. (Title 18, United States Code, Sections 2703(a), (b)(1)(A) & (c)(1)(A)).  Specifically, the Court is "a

2

district court of the United States . . . that – has jurisdiction over the offense being investigated."
(Title 18, United States Code, Section 2711(3)(A)(i))).

## RELEVANT STATUTORY PROVISIONS

6.      **Conspiracy to Commit Wire Fraud and Health Care Fraud:** 18 U.S.C. §
1349 provides that any person who attempts or conspires to commit a wire fraud or health care
fraud offense shall be subject to the same penalties as those prescribed for the offense, the
commission of which was the object of the attempt or conspiracy.

7.      **Wire Fraud:** 18 U.S.C. § 1343 provides that it is unlawful for any person to
devise a scheme to defraud, or for obtaining money or property by means of false or fraudulent
pretenses and cause an interstate wire communication in furtherance of the scheme.

8.      **Health Care Fraud:** 18 U.S.C. § 1347 provides that it is unlawful for any person
to devise a scheme to defraud a health care benefit program or to obtain any of the money under
the custody or control of a health care benefit program by false or fraudulent pretenses.

## OVERVIEW OF THE MEDICAID PROGRAM

9.      The Medicaid program, established by Title 19 of the Social Security Act of 1965,
provides medical assistance to indigent persons.  The U.S. Department of Health and Human
Services (HHS) and the Commonwealth of Virginia, Department of Medical Assistance Services
(DMAS), administer and supervise the Medicaid program in Virginia, which is called the
Virginia Medical Assistance Program (VMAP).  Funding for Medicaid comes from both the
federal and state governments.

10.     The Commonwealth of Virginia offers various waivers under the VMAP which
afford non-medical intervention to Medicaid recipients.  The Elderly or Disabled with Consumer
Direction (EDCD) Waiver offers recipients an alternative to nursing facility placement by

3

allowing them to remain in their home and receive assistance with their daily living from DMAS qualified companies/individuals.  Eligible Medicaid recipients can acquire home and community based care services, including personal care and respite care services which are provided by DMAS qualified Personal Care Aides (PCAs).

11.    Personal care services are long-term basic health-related services, such as helping with ambulation/exercises, assisting with self-administered medications, reporting changes in the recipient's condition and needs, or providing household services essential to health in the home.

12.    Respite care service is the provision of short-term, temporary relief to the unpaid individual who is caring for the Medicaid recipient (typically a family member), referred to by DMAS as the "primary caregiver."

13.    The Virginia Medicaid Program allows the EDCD recipient to choose either Consumer or Agency Directed Care for their home health care.

14.    With Agency Directed Care a licensed Home Health Agency, approved by Medicaid,  controls the hiring and placement of a PCA in the recipient's home and manages the training, scheduling, and payment for that PCA.

15.    In contrast, the Consumer-Directed Care model empowers the recipient, or a representative for the recipient (such as a parent), to hire and manage the schedule and training of the PCA providing the personal and/or respite care in the recipient's home.   The recipient or representative who assumes this responsibility is referred to by DMAS as the Employer of Record (EOR).  The EOR is also responsible for facilitating the PCA's pay by validating and submitting the PCA's weekly timesheets to the Medicaid fiscal intermediary.

16.    For Consumer-Directed Care, DMAS requires there to be a Service Facilitator to ensure the recipient is receiving the needed and required services. The Service Facilitator is an

4

independent agency enrolled as a Medicaid Provider and entitled to be reimbursed by Medicaid for services performed.

17.     All of these visits are non-medical in nature and are viewed as administrative tasks, which can be performed by non-licensed, non-medically trained personnel who have completed the four DMAS Training Modules for Service Facilitators that became mandatory in March 2015.

18.     All Medicaid Providers agree to abide by VMAP rules and regulations as outlined in the DMAS Participation Agreement attached to their Enrollment Application.  DMAS requires Medicaid Providers to update both their Enrollment Application and Participation Agreement every five years.

19.     All Medicaid Providers have access to the Virginia Medicaid EDCD Provider Manual (the Manual) which is made available electronically at https://www.ecm.virginiamedicaid.dmas.virginia.gov.  This Manual explains the Medicaid rules, and regulations, specific to the service for which the Medicaid Provider is enrolled.  DMAS also offers other tools and resources to educate Medicaid Providers on VMAP rules and regulations, including access to the DMAS internet website, direct mailings, and telephone "hotlines."

20.     Service Facilitators may bill for the services they provide.  Chapter IV of The Manual defines the five different billing codes specific to Service Facilitators to include where the service will be provided and how frequently the service can be billed.  Listed below are the five billing codes specific to Service Facilitators:

a.    Comprehensive Home Visit:  occurs once upon entry into program (code H2000)

b.    Consumer Training for the Recipient/EOR: occurs once upon entry into program (code S5109)

5

c.  Routine On-Site Visit: maximum 10 per year (code 99509)

d.  Management Training (for Non-Family): rendered only upon the request made by the Recipient/EOR: can bill 4 hours of training per every 6 months  (code S5116)

e.  Reassessment Visit: occurs twice a year (code T1028)

21.     In defining these five codes, the Manual clearly addresses that each of these services is to be held in the home of and face-to-face with the Recipient/EOR.  The Manual also directs Service Facilitators to be available by telephone for clients during normal business hours, have voice mail capability, and return phone calls within 1 business day.

22.     Chapter VI of the Manual describes "Utilization Reviews."  Pursuant to Title 42, Code of Federal Regulations, Parts 455 and 456, VMAP must provide for continuing review and evaluation of the care and services paid through Medicaid.  Accordingly, DMAS or its contractor Myers and Stauffer, CPA regularly schedule or announce audits of Medicaid Providers.  These audits can prove to be educational to the Provider and/or serve as a tool by which DMAS identifies a Provider suspected of conducting business indicative of fraud and/or abuse.

## PROBABLE CAUSE

### A.    Introduction – A Tender Heart, LLC

23.     Katrina Lynch (LYNCH), the owner/operator of A Tender Heart, LLC (A TENDER HEART), is enrolled with VMAP as an authorized Medicaid Provider.  Specifically, LYNCH is authorized to act as a Service Facilitator in Richmond, Virginia and its surrounding cities/counties, including Chesterfield, Powhatan, Charlottesville, Farmville and Staunton.

24.     LYNCH signed and submitted to DMAS her initial Enrollment Application with the Participation Agreement dated November 15, 2011.  She requested the effective date of enrollment be November 1, 2011.

25.     On this Enrollment Application, LYNCH listed her company mailing address as P.O. Box 36547, North Chesterfield, Virginia 23235.  LYNCH listed the physical address of her business as 11606 New Forest Trail, Midlothian, Virginia 23112.  And LYNCH indicated her email address was Katrina.Lynch24@yahoo.com.

26.     Also on the Enrollment Application, LYNCH elected to submit her billing claims electronically by Claims Direct Data Entry through the Virginia Medicaid Web Portal and she listed herself as the Billing Representative.

27.     On November 20, 2012, an application to form a Limited Liability Company called A Tender Heart was filed with the Virginia State Corporation Commission.  On this application, the Registered Agent for A Tender Heart, LLC was listed as Derrick D. Simmons, and Simmons' home address, 4730 Stirrup Circle, Chesterfield, Virginia was listed as the "Principal Office Address."

28.     LYNCH renewed her Virginia Medicaid Provider Enrollment Application on September 13, 2016.  On the 2016 Enrollment Application, LYNCH listed the same physical address as her 2011 Enrollment Application and she indicated that the New Forest Trail address should also be used as her company's mailing address.  On the 2016 Enrollment Application, LYNCH listed her email address as atenderheartva@gmail.com.  Again, LYNCH elected to submit claims electronically through the Medicaid Web Portal and stated that she was the sole owner of the company.

29.     DMAS modified the 2016 Enrollment Application, altering or adding several questions.  For Example, Question 29 referred to a Criminal Offense Disclosure and asked, "Has anyone associated with your organization (owner, operators, managers or employees) been convicted of a criminal offense?"  Lynch responded, "NO."

7

30.     However, according to the National Crime Information Center (NCIC), LYNCH was arrested in August 2008 by the Chesterfield County, Virginia Police Department related to a felony bad check.  Ultimately, she was convicted of a lesser included offense – issuing a bad check less than $200 – on February 19, 2009.

31.     LYNCH electronically provided her 2016 Enrollment Application and Participation Agreement with her digital signature to DMAS acknowledging as quoted in the document, "Any person who knowingly submits this application containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."  Moreover, the signed Participation Agreement read, "The Provider agrees to comply with all applicable state and federal laws...."

32.     In or about May 2017 there existed an active website for A TENDER HEART: www.atenderheartva.com that claimed to be copyrighted in 2014.  The site provided a picture for and named each employee as: Katrina Lynch, Charlayne Green, Javon Jackson and Lenora Jones Elliott.  In a section titled "About Our Company" the website stated that A TENDER HEART employees had over 60 years combined experience and offered a multitude of home health services including that of Service Facilitator.  The contact information on the website included the address of 11606 New Forest Trail, Midlothian, Virginia, telephone number (804) 396-9536, and email address atenderheartva@gmail.com.

**B.     DMAS Audits**

33.     On June 25, 2015, as part of a routine review of A TENDER HEART, DMAS officials requested that LYNCH provide records to support billing between September 1, 2012 and November 30, 2013 for 90 specified recipients.

8

34.     In a certified letter from DMAS officials to LYNCH dated August 20, 2015, DMAS indicated that based on their review LYNCH had not provided adequate documentation to support the billing during that period for the specified recipients. As a result, LYNCH was required to repay Medicaid $76,419.52. LYNCH did not refute the findings and the full amount was deducted from future billings submitted by LYNCH.

35.     Based on the 2015 review, DMAS referred their findings to the Virginia Commonwealth Attorney General's Office, Medicaid Fraud Control Unit (MFCU). During the same timeframe, DMAS also requested that Myers and Stauffer, CPA conduct an independent audit of A TENDER HEART.

36.     LYNCH was contacted to schedule this audit. But she postponed, claiming that she had a bed bug infestation at her house which also served as the business location. Eventually, on May 10, 2017, Myers and Stauffer, CPA conducted an audit of A TENDER HEART at the residential address 11606 New Forest Trail, Midlothian, Virginia 23112. Auditors asked LYNCH (who was present for the audit) to produce records to support billing between October 1, 2015 and September 30, 2016 for 21 specified recipients. LYNCH produced records electronically copied from her home computer for the audit team.

37.     LYNCH also told auditors that A TENDER HEART employed the following individuals: Javon Jackson, Randall Cort, Charlayne Green, Lenora Elliott, David Lee and Ken Heath. LYNCH only produced certification showing completion of required DMAS training modules for 2 of her 6 employees – specifically, she produced certification for Heath and Lee. LYNCH did not mention the Registered Agent, and biller for A TENDER HEART– Derrick Simmons.

38.     In a September 11, 2017 letter from Myers and Stauffer, CPA to LYNCH, auditors indicated that LYNCH had not provided adequate documentation to support the billing for the specified recipients.   As a result, LYNCH was required to repay Medicaid $258,916.03. LYNCH did not refute the findings and the full amount was deducted from future billings submitted by LYNCH.

39.     Shortly thereafter, in October 2017, this matter was referred to the FBI Richmond Field Office.

C.     **Billing Analysis**

40.     Based on Medicaid billing data for 156 recipients supposedly serviced by A TENDER HEART during the period of December 2011 through March 30, 2018, A TENDER HEART was paid by VMAP for each year as follows:

2011: $0

2012: $27,200.85

2013: $73,767.24

2014: $312,123.14

2015: $361,627.64

2016: $807,525.88

2017: $1,218,187.00

2018 (thus far): $252,487.38

41.     On June 12, 2018, law enforcement agents interviewed Derrick Simmons. Simmons reported that he is a musician by trade, but was hired by LYNCH in 2012 to input billing data and submit the data to Medicaid using the Medicaid portal.   Although he had no experience as a biller, Simmons accepted the job, which he described as a data entry position.

10

42.     Simmons claimed that he had no ownership interest in A TENDER HEART, and that he had no knowledge that he was listed as the company's Registered Agent in documents filed with the State Corporation Commission. Instead, Simmons stated that he worked about four hours a week submitting billing data to Medicaid for which LYNCH paid him approximately $600 per week. LYNCH never issued Simmons a W-2 or Form 1099 for the income he earned from A TENDER HEART, and therefore Simmons never paid income taxes on these earnings.

43.     Simmons indicated that LYNCH provided him the specific data to submit to Medicaid – that is, the dates of service per code to bill for each Medicaid Recipient. Simmons received his direction from LYNCH primarily through email communication to his email account – scoobythedrummer@gmail.com. Simmons and LYNCH also communicated about the company over the telephone and by text message after LYNCH moved to Texas in or about 2014. Simmons last submitted claims for A TENDER HEART in or about May 2018.

44.     Analysis of Medicaid claims, witness interviews, and other records revealed that Simmons, as directed by LYNCH, routinely submitted bills to Medicaid for services A TENDER HEART never provided.

45.     A TENDER HEART billed Medicaid for services the company supposedly provided on almost every day of each calendar year including weekends and holidays for each of its 156 recipients. Had A TENDER HEART billed consistent with the rules and regulations for each billing code, at most the company could only have submitted a yearly average of twelve claims per recipient.

46.     That is, if A TENDER HEART only billed for the maximum number of claims permitted for each billing code (3,363 claims) for each of its 156 Medicaid Recipients, the

11

company would have been entitled to $236,285.54 from its inception in 2011 through May 2018.

47.     Instead, A TENDER HEART submitted 47,686 claims to Medicaid for its 156 Medicaid Recipients and thus was paid $3,052,919.13. Put another way, Medicaid paid A TENDER HEART $2,816,633.59 to which it was not entitled.

48.     For example, A TENDER HEART billed for services supposedly provided after 12 Medicaid Recipients died. Specifically, A TENDER HEART submitted 566 claims after Medicaid Recipients died. Several of these claims were denied, but Medicaid still paid the company $4,656.16 to which it was not entitled.

49.     Additionally, 24 Medicaid Recipients were in a hospital or rehabilitation center on dates A TENDER HEART billed Medicaid for services (which are only to occur in the Medicaid Recipient's home). Specifically, A TENDER HEART submitted 247 claims when Medicaid Recipients were in the hospital or a rehabilitation center, which caused Medicaid to pay the company $17,799.10 to which it was not entitled.

50.     The money paid by Medicaid to A TENDER HEART was deposited into business bank accounts opened and maintained by Lynch. An analysis of these bank accounts revealed extensive personal expenditures by LYNCH to include overseas travel, casino gambling, cosmetic surgery, jewelry, vehicles, and rental property.

**D.     A Tender Heart, LLC Clients**

51.     To date, the investigative team has interviewed at least 35 EORs and/or Medicaid Recipients serviced by A TENDER HEART. The EORs and/or Medicaid Recipients reported that LYNCH, Lee, Heath, Elliott or Green conducted initial assessments or home visits. Most EORs and/or Medicaid Recipients indicated that they rarely met in person with employees from A TENDER HEART, and instead they communicated with their Service Facilitator by telephone,

text messaging or email.

52.     None of the EORs and/or Medicaid Recipients received any paperwork from A TENDER HEART. But they all reported that during home visits employees (except Elliott and Green) transcribed on computer tablets their responses to questions regarding changes in the Medicaid Recipient's health, medications, daily routines, and doctors. EORs also reported providing their digital signatures on these tablets.

53.     All of the EORs and/or Medicaid Recipients stated that no one from A TENDER HEART met with them to the extent represented in claims submitted to Medicaid. Several had never met with LYNCH or anyone from A TENDER HEART for over a year.

### Medicaid Recipient-1

54.     For example, the EOR (parent) for Recipient-1 reported that A TENDER HEART began acting as Recipient-1's Service Facilitator in or about late 2011. LYNCH conducted the Comprehensive Home Visit and subsequent Routine On-Site Visits into early 2012. No one from A TENDER HEART visited the EOR and/or Medicaid Recipient-1 from November 2015 until June 2017.

55.     The EOR reported that no one from A TENDER HEART ever conducted a home visit on a weekend, while Recipient-1 was at one of his many therapy sessions at the Children's Hospital, or while Recipient-1 attended a surfer retreat from August 21 through 23, 2015. Nevertheless, A TENDER HEART billed Medicaid for dates of service that occurred on weekends and on August 23, 2015 while Recipient-1 was at a surfer retreat.

56.     A TENDER HEART billed Medicaid for services purportedly provided to Recipient-1 from 2011 through 2018. Pursuant to those 163 claims, Medicaid paid A TENDER HEART $11,270.46. Most of those claims included requests for reimbursement of services that

13

never occurred and furthermore would not have been permissible as they exceeded the maximum allowable times a code could be billed. For example, of the 34 claims submitted for Reassessment Visits (code T1028), only eight would have been allowed during the time period Recipient-1 was a client of A TENDER HEART.

57.     Of the 163 total claims submitted on behalf of Recipient-1 by A TENDER HEART, only 36 would have been permissible and therefore A TENDER HEART was only entitled to be paid $2,513.94.

### Medicaid Recipient-2

58.     As another example, the EOR (parent) for Recipient-2 reported that A TENDER HEART began acting as Recipient-2's Service Facilitator in or about September 2013.  LYNCH conducted the Comprehensive Home Visit and subsequent Routine On-Site Visits into early 2014.  In the beginning, someone from A TENDER HEART conducted Routine On-Site Visits once a month, but those home visits were soon replaced by telephone text messages.

59.     The EOR reported that no one from A TENDER HEART ever conducted a home visit on a weekend nor while Recipient-2 was at his father's home as was required for court ordered visitation.  Nevertheless, A TENDER HEART billed Medicaid for dates of service that occurred on weekends, when Recipient-2 was at his father's home, and during the dates between August 13-20, 2016, and September 24-30, 2016 when Recipient-2 was out of state on family vacations.

60.     A TENDER HEART billed Medicaid for services purportedly provided to Recipient-2 from 2011 through 2018.  Pursuant to those 381 claims, Medicaid paid A TENDER HEART $30,032.03.  Most of those claims included requests for reimbursement of services that never occurred and furthermore would not have been permissible as they exceeded the maximum

14

allowable times a code could be billed.  For example, of the 39 claims submitted for

Reassessment Visits (code T1028), only seven would have been allowed during the time period

Recipient-2 was a client of A TENDER HEART.

61.     Of the 381 total claims submitted on behalf of Recipient-2 by A TENDER

HEART, only 41 would have been permissible and therefore A TENDER HEART was only

entitled to be paid $2,851.52.

**Medicaid Recipient-3**

62.     Lenora Elliott, a former employee of A TENDER HEART, is the sister of

Recipient-3.  Elliott reported that A TENDER HEART began acting as Recipient-3's Service

Facilitator in January 2015.  LYNCH assigned Elliot to act as her sister's Service Facilitator.

Thereafter, Elliott conducted Routine On-Site Visits every month and electronically transmitted

her paperwork to A TENDER HEART using her assigned email address

atenderheart4@gmail.com.  In or about November 2015, Elliott and Recipient-3 moved away

from the Richmond area and Elliott stopped working for A TENDER HEART.

63.     LYNCH then assigned David Lee to act as Recipient-3's Service Facilitator.  Lee

did not conduct Routine On-Site Visits in person.  Instead, he communicated with Elliott over

the telephone, by text messages, and from his email account atenderheart2@gmail.com.

64.     A TENDER HEART billed Medicaid for services purportedly provided to

Recipient-3 from 2015 through 2018.  Pursuant to those 680 claims, Medicaid paid A TENDER

HEART $26,122.73.  Most of those claims included requests for reimbursement of services that

never occurred and furthermore would not have been permissible as they exceeded the maximum

allowable times a code could be billed.  For example, of the 50 claims submitted for

Reassessment Visits (code T1028), only five would have been allowed during the time

15

Recipient-3 was a client of A TENDER HEART.

65.     Of the 680 total claims submitted on behalf of Recipeint-3 by A TENDER HEART, only 23 would have been permissible and therefore A TENDER HEART was only entitled to be paid $1,694.03.

### Medicaid Recipient-4

66.     The EOR (parent) for Recipient-4 reported that A TENDER HEART began acting as Recipient-4's Service Facilitator in May 2012. Around that time, David Lee conducted the Comprehensive Home Visit over the telephone. In fact, the EOR and/or Recipient-4 has never met with any A TENDER HEART employee in person.

67.     Moreover, A TENDER HEART billed Medicaid for dates of service that occurred on weekends, and during times that Recipient-4 was out of town or at medical appointments.

68.     A TENDER HEART billed Medicaid for services purportedly provided to Recipient-4 from 2012 through 2018. Pursuant to those 58 claims, Medicaid paid A TENDER HEART $4,219.23. Most of those claims included requests for reimbursement of services that never occurred and furthermore would not have been permissible as they exceeded the maximum allowable times a code could be billed. For example, of the 10 claims submitted for Reassessment Visits (code T1028), only six would have been allowed during the time Recipient-4 was a client of A TENDER HEART.

69.     Of the 58 total claims submitted on behalf of Recipient-4 by A TENDER HEART, only 22 would have been permissible and therefore A TENDER HEART was only entitled to be paid $1,634.09.

## **Medicaid Recipient-5**

70.     The EOR (daughter) for Recipient-5 reported that A TENDER HEART began

acting as Recipient-5's Service Facilitator in October 2016.  However, A TENDER HEART

never conducted a Comprehensive Home Visit.  The EOR also stated that A TENDER HEART

employee Ken Heath conducted Routine On-Site Visits only three times in 2017.

71.     Due to Recipient-5's deteriorating health, the EOR requested from A TENDER

HEART Medicaid authorization for increased work hours for the Recipient's Attendant so that

more care could be provided to Recipient-5.

72.     The EOR reported that the lack of response to her repeated telephone messages

left on the main telephone number for A TENDER HEART prompted her to send an email on

June 26, 2017 to Heath's email address as displayed on his business card:

atenderheartva5@gmail.com.  The EOR wrote, *"Good afternoon, I am still waiting for someone*

*to call me.  Since no one is calling me may I please have Lee's manager name and number*

*please."*

73.     The EOR continued to email and call with medical updates about Recipient-5's

medical issues and doctor appointments, but no one from A TENDER HEART came to their

home.

74.     The EOR received a response on August 30, 2017 from

atenderheartva2@gmail.com, which read, *"....All documents you sent have been uploaded to the*

*web with additional explanation of the situation.  I am expecting to see a decision on it tomorrow*

*and plan to follow up with them to confirm.  Your update will immediately follow.  I've also*

*copied Kenneth and my supervisor on this email....- David."*

17

75.     The EOR received another response on September 7, 2017 from A TENDER

HEART employee David Lee using email address atenderheartva2@gmail.com. This email read

in sum *"...I do have an update, though it's not what we hoped for at this moment. We have been

notified that your father's care was converted to a different services company, Magellan, which

means we had to resubmit and get the authorization through them........I know this is another

headache for you, but please understand we feel the same way and want to see this through to

the end. I have attached Kenneth and my supervisor on this email.... Regards, David."*

76.     Despite A TENDER HEART having not conducted any Routine On-site Visits in

order to re-evaluate Recipient-5 for the authorization request to Medicaid, A TENDER HEART

billed Medicaid from June 27, 2017 through August 31, 2017 for 66 Routine On-site Visits.

77.     A TENDER HEART billed Medicaid for services purportedly provided to

Recipient-5 from October 2016 through 2018. Pursuant to those 329 claims, Medicaid paid A

TENDER HEART $12,408.81. Most of those claims included requests for reimbursement of

services that never occurred and furthermore would not have been permissible as they exceeded

the maximum allowable times a code could be billed. For example, of the 25 claims submitted

for Reassessment Visits (code T1028), only three would have been allowed during the time

Recipient-5 was a client of A TENDER HEART.

78.     Of the 329 total claims submitted on behalf of Recipient-5 by A TENDER

HEART, only 10 would have been permissible and therefore A TENDER HEART was only

entitled to have been paid $657.16.

### Medicaid Recipient-6

79.     The EOR (parent) for Recipient-6 reported that A TENDER HEART began acting

as Recipient-6's Service Facilitator in 2012. The EOR reported that Ken Heath from A

18

TENDER HEART conducted the On-Site Visits. Heath used a computer tablet in lieu of paperwork for these meetings, and the EOR provided a signature on the tablet at the conclusion of each meeting. The EOR never received a copy of the reports.

80.     Ken Heath did not conduct any On-Site Visits during year 2015, nor on weekends, nor during a time when Recipient-6 was not at home. However, A TENDER HEART billed Medicaid for dates of service that occurred on weekends, and during dates Recipient-6 was not in the home including May 9, 2015 when Recipient-6 was hospitalized.

81.     The EOR reviewed records obtained from A TENDER HEART during the DMAS Audit, including Assessment Reports, Medication Logs and Progress Notes. Progress Notes dated February 13 and March 21, 2013 read *"0 changes at this time,"* and was signed by *"D. Lee."* The EOR never met with or talked to A TENDER HEART employee other than Ken Heath. The EOR insisted that A TENDER HEART employee David Lee never visited her home.

82.     An Assessment Report for Recipient-6 dated March 26, 2016 included the EOR's signature and the signature of *"K.H."* However, the EOR reported that Recipient-6 was away from home after school on March 26, 2016, and that the EOR never met with Heath without Recipient-6 nor on weekends.

83.     A TENDER HEART billed Medicaid for services purportedly provided to Recipient-6 from 2012 through 2018. Pursuant to those 845 claims, Medicaid paid A TENDER HEART $59,135.32. Most of those claims included requests for reimbursement of services that never occurred and furthermore would not have been permissible as they exceeded the maximum allowable times a code could be billed. For example, of the 90 claims submitted for Reassessment Visits (code T1028), only 10 would have been allowed during the time Recipient-6 was a client of A TENDER HEART.

84.     Of the 845 total claims submitted on behalf of Recipient-6 by A TENDER HEART, only 55 would have been permissible and therefore A TENDER HEART was only entitled to have been paid $3,639.77.

## Medicaid Recipient-7

85.     The EOR (parent) for Recipient-7 reported that A TENDER HEART began acting as Recipient-7's Service Facilitator started in 2012. The EOR reported that A TENDER HEART employees Charlayne Green and Lenora Elliott conducted Routine On-Site Visits, but no more than one time per year.

86.     A TENDER HEART billed Medicaid for services purportedly provided to Recipient-7 from August 2012 through 2018. Pursuant to those 842 claims, Medicaid paid A TENDER HEART $53,281.42. Most of those claims included requests for reimbursement of services that never occurred and furthermore would not have been permissible as they exceeded the maximum allowable times a code could be billed. For example, of the 82 claims submitted for Reassessment Visits (code T1028), only 11 would have been allowed during the time Recipient-6 was a client of A TENDER HEART.

87.     Of the 842 claims submitted on behalf of Recipient-7 by A TENDER HEART, only 54 would have been permissible and therefore A TENDER HEART was only entitled to have been paid $3,431.68.

**E.     A Tender Heart, LLC Employees**

88.     On February 8, 2018, the FBI interviewed David Lee. Lee stated that LYNCH hired him in 2012. Thereafter, LYNCH trained Lee on how to act as a Service Facilitator, and how to complete the necessary paperwork required by Medicaid. In or about 2017, LYNCH

promoted Lee to an Administrative role so Lee no longer conducts home visits.

89.     Lee acknowledged that each employee was assigned by LYNCH a Google based email address. Lee explained that each employee was assigned a computer tablet on which the required forms are completed with the clients. Upon completion the forms were electronically submitted to Lynch who directed Derrick Simmons on what to bill per recipient.

90.     Immediately following this FBI interview, Lee telephoned the FBI to report that he had just confirmed with LYNCH that Derrick Simmons was no longer employed at A TENDER HEART.

91.     On May 9, 2018, the FBI interviewed Lenora Elliott. LYNCH hired Elliott in April 2014 initially as an office employee, but later LYNCH trained her to perform Routine On-Site visits. Elliott acknowledged that she was assigned the email address atenderheart4@gmail.com and that she used this email address to transmit the client's paperwork to Simmons at his personal email address.

92.     On May 23, 2018 the FBI interviewed Ken Heath. LYNCH hired Heath in October 2015. Heath acknowledged that he was assigned the email address atenderheartva5@gmail.com and that he used this email address to transmit the client's paperwork to LYNCH.

93.     On June 12, 2018, the FBI interviewed Derrick Simmons. Simmons was hired by LYNCH in or about early 2012. Simmons claimed his only job at A TENDER HEART was that of the biller. Simmons received on his personal email account scoobythedrummer@gmail.com, the weekly directions from LYNCH as to what to bill her client. Simmons said he used five different billing codes although he could not remember what they were. Simmons also reported that he last billed Medicaid for A TENDER HEART as directed by Lynch in May 2018 (contrary

21

to Lee's report that Simmons was no longer working in February 2018 as the biller).

## BACKGROUND CONCERNING E-MAIL

94.    In my training and experience, I have learned that Google provides a variety of on-line services, including electronic mail ("e-mail") access, to the public. Google allows subscribers to obtain e-mail accounts at the domain name gmail.com, like the e-mail accounts listed in Attachment A. Subscribers obtain an account by registering with Google. During the registration process, Google asks subscribers to provide basic personal information. Therefore, the computers of Google are likely to contain stored electronic communications (including retrieved and un-retrieved e-mail for Google subscribers) and information concerning subscribers and their use of Google services, such as account access information, e-mail transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

95.    A Google subscriber can also store with the provider files in addition to e-mails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to e-mails), and other files, on servers maintained and/or owned by Google. In my training and experience, evidence of who was using an e-mail account may be found in address books, contact or buddy lists, e-mail in the account, and attachments to e-mails, including pictures and files.

96.    In my training and experience, e-mail providers generally ask their subscribers to provide certain personal identifying information when registering for an e-mail account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of

payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

97.     In my training and experience, e-mail providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, e-mail providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

98.     In my training and experience, in some cases, e-mail account users will communicate directly with an e-mail service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. E-mail providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

23

99.   In general, an e-mail that is sent to a Gmail subscriber is stored in the subscriber's "mail box" on Google Corporation's servers until the subscriber deletes the e-mail. If the subscriber does not delete the message, the message can remain on Google Corporation's servers indefinitely. Even if the subscriber deletes the e-mail, it may continue to be available on Google Corporation's servers for a certain period of time.

100.   Based on what I know about the storage and deletion of e-mail communication by a subscriber, I have requested by way of a Preservation Letter addressed to Google that this data be maintained by the Service Provider for the allowable 180 days which is due to expire September 5, 2018, with the expectation that a search warrant will be acquired for the production of such data.

## CONCLUSION

101.   Based on the forgoing, I respectfully submit that there is probable cause to believe that the SUBJECT EMAIL ACCOUNTS, further described in Attachment A, contain evidence and instrumentalities of violations of Title 18, United States Code, Section 1347, further described in Attachment B.

102.   I respectfully request that the Court issue the proposed search warrant. Because the warrant will be served on Google, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

24

Respectfully submitted,

Leah C. Wynn

Special Agent, FBI

Subscribed and sworn to before me on this 16th day of August, 2018.

/s/

Roderick C. Young
United States Magistrate Judge

United States Magistrate Judge

25

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be disclosed by Google, Inc. (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any emails, records, files, logs, or information that has been deleted but is still available to the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.      The contents of all e-mails associated with the account, including stored or preserved copies of e-mails sent to and from the account, draft e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

b.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.      The types of service utilized;

d.      All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

e.      All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

**II.     Information to be seized by the government**

All information described above in Section I that constitutes evidence and instrumentalities of violations of 18 U.S.C. §§ 1349, 1343, 1347 occurring between January 1, 2012, and present, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a.     Communications regarding violations of 18 U.S.C. §§ 1349, 1343, 1347 including, but not limited to communications relating to: A Tender Heart, LLC, Medicaid Recipients, billing and billing codes, employee training, Medicaid audits, as well as communications related to money transfers, payments, expenses, profits, accounting, banking and recordkeeping.

b.     The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

c.     Internet protocol address and other administrative information regarding the communications described in subparagraph a.

2

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the

laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information

contained in this declaration is true and correct.  I am employed by Google, Inc., and my official

title is _____.  I am a custodian of records for Google, Inc.  I state

that each of the records attached hereto is the original record or a true duplicate of the original

record in the custody of Google, Inc., and that I am the custodian of the attached records

consisting of _____ (pages/CDs/kilobytes). I further state that:

      a.     all records attached to this certificate were made at or near the time of the

occurrence of the matter set forth, by, or from information transmitted by, a person with

knowledge of those matters;

      b.     such records were kept in the ordinary course of a regularly conducted business

activity of Google, Inc.; and

      c.     such records were made by Google, Inc. as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal

Rules of Evidence.


_____     _____

Date                          Signature

3

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the e-mail account known as atenderheartva4@gmail.com that is stored at premises controlled by Google, Inc., a company that accepts service of legal process at 1600 Amphitheatre Parkway, Mountain View, CA 94043.